EILEEN M. DECKER
United States Attorney
DENNISE D. WILLETT
Assistant United States Attorney
Chief, Santa Ana Branch Office
JOSHUA M. ROBBINS (Cal. State Bar No. 270553)
SCOTT D. TENLEY (Cal. State Bar No. 298911)
Assistant United States Attorneys
ASHWIN JANAKIRAM (Cal. State Bar No. 277513)
Special Assistant United States Attorney
    8000 United States Courthouse
    411 West Fourth Street
    Santa Ana, California 92701
    Telephone:  (714) 338-3538
    Facsimile:  (714) 338-3708
    Email: Joshua.Robbins@usdoj.gov

**UNDER SEAL**

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

FEB 23 2016

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

Attorneys for Plaintiff
UNITED STATES OF AMERICA

LODGED

2016 FEB 22 PM 3: ...

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION  SACR16-00014

| UNITED STATES OF AMERICA, | No. SA CR 16- |
|---|---|
| Plaintiff, | PLEA AGREEMENT FOR DEFENDANT LINDA MARTIN |
| v. | |
| LINDA MARTIN, | **[UNDER SEAL]** |
| Defendant. | |

1.   This constitutes the plea agreement between LINDA MARTIN ("defendant") and the United States Attorney's Office for the Central District of California ("the USAO") in the above-captioned case.  This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

//

//

1

DEFENDANT'S OBLIGATIONS

2.    Defendant agrees to:

        a)    Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to a one-count criminal Information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with Conspiracy in violation of 18 U.S.C. § 371.

        b)    Not contest facts agreed to in this agreement.

        c)    Abide by all agreements regarding sentencing contained in this agreement.

        d)    Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

        e)    Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

        f)    Be truthful at all times with Pretrial Services, the United States Probation Office, and the Court.

        g)    Pay the applicable special assessments at or before the time of sentencing unless defendant lacks the ability to pay and prior to sentencing submits a completed financial statement on a form to be provided by the USAO.

3.    Defendant further agrees:

        a)    Truthfully to disclose to law enforcement officials, at a date and time to be set by the USAO, the location of, defendant's ownership interest in, and all other information known

2

1  to defendant about, all monies, properties, and/or assets of any
2  kind, derived from or acquired as a result of, or used to facilitate
3  the commission of, defendant's illegal activities, and to forfeit
4  all right, title, and interest in and to such items.

5           b)    To the Court's entry of an order of forfeiture at or
6  before sentencing with respect to these assets and to the forfeiture
7  of the assets.

8           c)    To take whatever steps are necessary to pass to the
9  United States clear title to the assets described above, including,
10 without limitation, the execution of a consent decree of forfeiture
11 and the completing of any other legal documents required for the
12 transfer of title to the United States.

13          d)    Not to contest any administrative forfeiture
14 proceedings or civil judicial proceedings commenced by the United
15 States of America against these properties.

16          e)    Not to assist any other individual in any effort
17 falsely to contest the forfeiture of the assets described above.

18          f)    Not to claim that reasonable cause to seize the
19 assets was lacking.

20          g)    To prevent the transfer, sale, destruction, or loss
21 of any and all assets described above to the extent defendant has
22 the ability to do so.

23          h)    To fill out and deliver to the USAO a completed
24 financial statement listing defendant's assets on a form provided by
25 the USAO.

26     4.    Defendant further agrees to cooperate fully with the USAO,
27 the Federal Bureau of Investigation, the United States Postal
28 Service - Office of Inspector General, the Internal Revenue Service,

3

and, as directed by the USAO, any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authority.   This cooperation requires defendant to:

a)   Respond truthfully and completely to all questions that may be put to defendant, whether in interviews, before a grand jury, or at any trial or other court proceeding.

b)   Attend all meetings, grand jury sessions, trials or other proceedings at which defendant's presence is requested by the USAO or compelled by subpoena or court order.

c)   Produce voluntarily all documents, records, or other tangible evidence relating to matters about which the USAO, or its designee, inquires.

5.   For purposes of this agreement: (1) "Cooperation Information" shall mean any statements made, or documents, records, tangible evidence, or other information provided, by defendant pursuant to defendant's cooperation under this agreement; and (2) "Plea Information" shall mean any statements made by defendant, under oath, at the guilty plea hearing and the agreed to factual basis statement in this agreement.

THE USAO'S OBLIGATIONS

6.   The USAO agrees to:

a)   Not contest facts agreed to in this agreement.

b)   Abide by all agreements regarding sentencing contained in this agreement.

c)   At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level,

4

1    pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move

2    for an additional one-level reduction if available under that

3    section.

4                d)    Except for criminal tax violations (including

5    conspiracy to commit such violations chargeable under 18 U.S.C.

6    § 371), not further criminally prosecute defendant for violations

7    arising out of defendant's conduct described in the agreed-to

8    factual basis set forth in paragraph 19 below, or any other conduct

9    relating to Pacific Hospital of Long Beach or Pacific Specialty

10   Physician Management.  Defendant understands that the USAO is free

11   to criminally prosecute defendant for any other unlawful past

12   conduct or any unlawful conduct that occurs after the date of this

13   agreement.  Defendant agrees that at the time of sentencing the

14   Court may consider the uncharged conduct in determining the

15   applicable Sentencing Guidelines range, the propriety and extent of

16   any departure from that range, and the sentence to be imposed after

17   consideration of the Sentencing Guidelines and all other relevant

18   factors under 18 U.S.C. § 3553(a).

19        7.   The USAO further agrees:

20             a)    Not to offer as evidence in its case-in-chief in the

21   above-captioned case or any other criminal prosecution that may be

22   brought against defendant by the USAO, or in connection with any

23   sentencing proceeding in any criminal case that may be brought

24   against defendant by the USAO, any Cooperation Information.

25   Defendant agrees, however, that the USAO may use both Cooperation

26   Information and Plea Information:  (1) to obtain and pursue leads to

27   other evidence, which evidence may be used for any purpose,

28   including any criminal prosecution of defendant; (2) to cross-

examine defendant should defendant testify, or to rebut any evidence offered, or argument or representation made, by defendant, defendant's counsel, or a witness called by defendant in any trial, sentencing hearing, or other court proceeding; and (3) in any criminal prosecution of defendant for false statement, obstruction of justice, or perjury.

b)   Not to use Cooperation Information against defendant at sentencing for the purpose of determining the applicable guideline range, including the appropriateness of an upward departure, or the sentence to be imposed, and to recommend to the Court that Cooperation Information not be used in determining the applicable guideline range or the sentence to be imposed.  Defendant understands, however, that Cooperation Information will be disclosed to the probation office and the Court, and that the Court may use Cooperation Information for the purposes set forth in U.S.S.G § 1B1.8(b) and for determining the sentence to be imposed.

c)   In connection with defendant's sentencing, to bring to the Court's attention the nature and extent of defendant's cooperation.

d)   If the USAO determines, in its exclusive judgment, that defendant has both complied with defendant's obligations under paragraphs 2 through 4 above and provided substantial assistance to law enforcement in the prosecution or investigation of another ("substantial assistance"), to move the Court pursuant to U.S.S.G. § 5K1.1, to fix an offense level and corresponding guideline range below that otherwise dictated by the sentencing guidelines, and to recommend a term of imprisonment within this reduced range.

//

DEFENDANT'S UNDERSTANDINGS REGARDING COOPERATION

8.   Defendant understands the following:

a)   Any knowingly false or misleading statement by defendant will subject defendant to prosecution for false statement, obstruction of justice, and perjury and will constitute a breach by defendant of this agreement.

b)   Nothing in this agreement requires the USAO or any other prosecuting, enforcement, administrative, or regulatory authority to accept any cooperation or assistance that defendant may offer, or to use it in any particular way.

c)   Defendant cannot withdraw defendant's guilty plea if the USAO does not make a motion pursuant to U.S.S.G. § 5K1.1 for a reduced guideline range or if the USAO makes such a motion and the Court does not grant it or if the Court grants such a USAO motion but elects to sentence above the reduced range.

d)   At this time the USAO makes no agreement or representation as to whether any cooperation that defendant has provided or intends to provide constitutes or will constitute substantial assistance.  The decision whether defendant has provided substantial assistance will rest solely within the exclusive judgment of the USAO.

e)   The USAO's determination whether defendant has provided substantial assistance will not depend in any way on whether the government prevails at any trial or court hearing in which defendant testifies or in which the government otherwise presents information resulting from defendant's cooperation.

7

NATURE OF THE OFFENSE

9.    Defendant understands that for defendant to be guilty of the crime charged in count one of the Information, that is, Conspiracy, in violation of Title 18, United States Code, Section 371, the following must be true:  (1) Beginning at least in or around September 2010 and continuing through at least in or around February 2013, there was an agreement between two or more persons to commit a violation of Title 18, United States Code, Sections 1341 and 1346 (Mail Fraud and Honest Services Mail Fraud); Title 18, United States Code, Section 1952(a)(3) (Interstate Travel in Aid of a Racketeering Enterprise); Title 18, United States Code, Section 1957 (Monetary Transactions in Property Derived from Specified Unlawful Activity); and Title 42, United States Code, Section 1320a-7b(b)(2)(A) (Payment or Receipt of Kickbacks in Connection with a Federal Health Care Program); (2) defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and (3) one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

10.    Defendant understands that Mail Fraud, in violation of Title 18, United States Code, Section 1341, has the following elements:  (1) the defendant knowingly devised or participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations or promises; (2) the statements made or facts omitted as part of the scheme were material, that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; (3) the defendant acted with

8

the intent to defraud; and (4) the defendant used, or caused to be
used, the mails to carry out or attempt to carry out an essential
part of the scheme.  Defendant further understands that Honest
Services Mail Fraud, in violation of Title 18, United States Code,
Section 1346, has the following elements:  (1) the defendant devised
or participated in a scheme or plan to deprive a patient of his or
her right to honest services; (2) the scheme or plan consisted of a
bribe or kickback in exchange for medical services; (3) a medical
professional person owed a fiduciary duty to the patient; (4) the
defendant acted with the intent to defraud by depriving the patient
of his or her right of honest services; (5) the defendant's act was
material, that is, it had a natural tendency to influence, or was
capable of influencing, a person's acts; and (6) the defendant used,
or caused someone to use, the mails to carry out or attempt to carry
out the scheme or plan.

11.  Defendant understands that Interstate Travel in Aid of a
Racketeering Enterprise, in violation of Title 18, United States
Code, Section 1952(a)(3), has the following elements:  (1) defendant
used the mail or a facility of interstate commerce with the intent
to promote, manage, establish, or carry on, or facilitate the
promotion, management, establishment, or carrying on, of unlawful
activity, specifically payment and receipt of kickbacks in violation
of California Business & Professions Code § 650, California
Insurance Code § 750, and California Labor Code § 3215; and (2)
after doing so, defendant performed or attempted to perform an act
to promote, manage, establish, or carry on, or facilitate the
promotion, management, establishment, or carrying on, of such
unlawful activity.

9

1      12.   Defendant understands that Money Laundering, in violation

2  of Title 18, United States Code, Section 1957, has the following

3  elements:   (1) the defendant knowingly engaged or attempted to

4  engage in a monetary transaction; (2) the defendant knew the

5  transaction involved criminally derived property; (3) the property

6  had a value greater than $10,000; (4) the property was, in fact,

7  derived from mail fraud; and (5) the transaction occurred in the

8  United States.

9      13.   Defendant understands that Payment of Kickbacks in

10  Connection with a Federal Health Care Program, in violation of 42

11  U.S.C. § 1320a-7b(b)(2)(A), has the following elements:   (1)

12  defendant knowingly and willfully paid remuneration, directly or

13  indirectly, in cash or in kind, to another person; (2) the

14  remuneration was given to induce that person to refer an individual

15  for the furnishing or arranging for the furnishing of any item or

16  service for which payment may be made in whole or in part under a

17  Federal health care program; and (3) defendant knew that such

18  payment of remuneration was illegal.

19                  PENALTIES AND RESTITUTION

20      14.   Defendant understands that the total statutory maximum

21  sentence that the Court can impose for a violation of Title 18,

22  United States Code, Section 371, is:   5 years imprisonment; a 3-year

23  period of supervised release; a fine of $250,000 or twice the gross

24  gain or gross loss resulting from the offense, whichever is

25  greatest; and a mandatory special assessment of $100.

26      15.   Defendant understands that supervised release is a period

27  of time following imprisonment during which defendant will be

28  subject to various restrictions and requirements.   Defendant

understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

16. Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that once the court accepts defendant's guilty plea, it will be a federal felony for defendant to possess a firearm or ammunition. Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license. Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

17. Defendant understands that, if defendant is not a United States citizen, the felony conviction in this case may subject defendant to: removal, also known as deportation, which may, under some circumstances, be mandatory; denial of citizenship; and denial of admission to the United States in the future. The court cannot, and defendant's attorney also may not be able to, advise defendant fully regarding the immigration consequences of the felony convictions in this case. Defendant understands that unexpected

immigration consequences will not serve as grounds to withdraw
defendant's guilty plea.

18.   Defendant understands that defendant will be required to
pay full restitution to the victims of the offense to which
defendant is pleading guilty.  Defendant agrees that, in return for
the USAO's compliance with its obligations under this agreement, the
Court may order restitution to persons other than the victims of the
offense to which defendant is pleading guilty and in amounts greater
than those alleged in the count to which defendant is pleading
guilty.  In particular, defendant agrees that the Court may order
restitution to any victim of any of the following for any losses
suffered by that victim as a result:  (a) any relevant conduct, as
defined in U.S.S.G. § 1B1.3, in connection with the offense to which
defendant is pleading guilty; and (b) any charges not prosecuted
pursuant to this agreement as well as all relevant conduct, as
defined in U.S.S.G. § 1B1.3, in connection with those counts and
charges.  The parties currently believe that the amount of
restitution is approximately $9.5 million, but agree that that
amount could change based on information the parties obtain before
sentencing.

FACTUAL BASIS

19.   Defendant admits that defendant is, in fact, guilty of the
offense to which defendant is agreeing to plead guilty.  Defendant
and the USAO agree to the statement of facts provided below and
agree that this statement of facts is sufficient to support a plea
of guilty to the charges described in this agreement and to
establish the Sentencing Guidelines factors set forth in paragraph
21 below, but is not meant to be a complete recitation of all facts

12

1   relevant to the underlying criminal conduct or all facts known to
2   either party that relate to that conduct.
3        Healthsmart Pacific Inc., doing business as Pacific Hospital of
4   Long Beach ("Pacific Hospital"), was a hospital located in Long
5   Beach, California, specializing in surgeries, particularly spinal
6   and orthopedic surgeries.  From at least in or around 1997 to
7   October 2013, Pacific Hospital was owned and/or operated by Michael
8   D. Drobot and other co-conspirators.
9        Specifically, from in or around September 2010 and to in or
10  around February 2013, in Orange and Los Angeles Counties, within the
11  Central District of California, and elsewhere, defendant, together
12  with other co-conspirators known and unknown to the United States
13  Attorney, knowingly combined, conspired, and agreed to commit the
14  following offenses against the United States:  Mail Fraud and Honest
15  Services Mail Fraud, in violation of Title 18, United States Code,
16  Sections 1341 and 1346; Interstate Travel in Aid of a Racketeering
17  Enterprise, in violation of Title 18, United States Code, Section
18  1952(a)(3); Monetary Transactions in Property Derived from Specified
19  Unlawful Activity, in violation of Title 18, United States Code,
20  Section 1957; and Payment or Receipt of Kickbacks in Connection with
21  a Federal Health Care Program, in violation of Title 42, United
22  States Code, Section 1320a-7b(b)(2)(A).
23       Specifically, from in or around September 2010 to in or around
24  February 2013, defendant conspired with Drobot, other hospital
25  employees, dozens of doctors, chiropractors, marketers, and others
26  to pay kickbacks in return for the referral of hundreds of patients
27  to Pacific Hospital for spinal surgeries and other medical services
28  paid for primarily through the California Workers' Compensation

1  System ("CWCS") and the Federal Employees' Compensation Act
2  ("FECA").  To channel the kickback payments, the co-conspirators
3  often used Drobot's company Pacific Specialty Physician Management,
4  Inc. ("PSPM").  In addition, the co-conspirators used Drobot's own
5  company, International Implants ("I2"), located in Newport Beach,
6  California, for medical hardware to be used in spinal surgeries in
7  order to obtain a larger kickback payment for each surgery.  In
8  paying the kickbacks, and submitting the resulting claims for spinal
9  surgeries and medical services and hardware, defendant and her co-
10 conspirators acted with the intent to defraud workers' compensation
11 insurance carriers and to deprive the patients of their right of
12 honest services.

13     Defendant was a marketer for Pacific Hospital.  As a marketer
14 for Pacific Hospital, defendant recruited chiropractors, physicians,
15 additional marketers, and others (the "kickback recipients") to
16 refer workers' compensation patients to Pacific Hospital for spinal
17 surgeries, other types of surgeries, toxicology, and other services,
18 to be paid through FECA and the CWCS.

19     Influenced by the promise of kickbacks, kickback recipients
20 referred patients insured through the CWCS and the FECA to Pacific
21 Hospital for spinal surgeries, other types of surgeries, and other
22 medical services.  The patients were not informed that the medical
23 professionals had been offered kickbacks to induce them to refer the
24 surgeries to Pacific Hospital.

25     Pursuant to the kickback agreements, kickback recipients
26 referred patients to Pacific Hospital.

27     Pacific Hospital submitted claims, by mail and electronically,
28 to workers' compensation insurance carriers for payment for the

surgeries and other medical services.   As defendant and her co-
conspirators knew, federal and California law prohibited paying or
receiving the aforementioned kickbacks for the referral of patients
for medical services.   Defendant and her co-conspirators also knew
that the insurance carriers would be unwilling to pay claims for
medical services that were obtained through such illegal kickbacks.
However, defendant's co-conspirators deliberately did not disclose
to the insurance carriers the kickbacks.

Further, to conceal the illegal kickback payments from the
workers' compensation insurance carriers and patients, defendant's
co-conspirators entered into bogus contracts with the kickback
recipients under which the kickback recipients purported to provide
services to, or receive services from, Drobot's companies to justify
the kickback payments.   The services and other items of value
discussed in those contracts were, in fact, provided at highly
inflated prices, if they were provided at all.   The compensation to
the kickback recipients was actually based on the number and type of
surgeries they referred to the hospital.   Defendant helped Drobot
and other co-conspirators to establish and maintain kickback
relationships disguised under various agreements.

For example, under a lease agreement, PSPM or Pacific Hospital
would lease or sublease office space from a doctor, but use only a
limited portion of the space for their own activities.   Instead,
payments to doctors under the lease agreements were kickback
payments in disguise, designed to incentivize surgery referrals to
Pacific Hospital.   Similarly, under a management agreement, PSPM
assumed financial responsibility for a doctor's office expenses and
paid a doctor a fixed percentage of the total amounts collected from

1  insurance for his services, in return for the right to keep the rest
2  of those insurance proceeds as its purported management fee.
3  However, PSPM typically lost money on these arrangements, because
4  the amounts paid to doctors were more than the net insurance
5  proceeds.   In reality, the payments made to doctors under these
6  management agreements were rewards for referring patients to Pacific
7  Hospital.

8      Defendant and her co-conspirators kept records of the number of
9  surgeries and other medical services performed at Pacific Hospital
10 due to referrals from kickback recipients, the amounts collected
11 from insurance carriers for those services, and the amounts paid to
12 kickback recipients for those referrals.   Periodically, defendant's
13 co-conspirators amended the bogus contracts with the kickback
14 recipients to increase or decrease the amount of agreed compensation
15 described in the contracts, in order to match the amount of
16 kickbacks paid or promised in return for referrals.

17     From in or around September 2010 to in or around February 2013,
18 Pacific Hospital billed workers' compensation insurance carriers
19 approximately $255 million in claims for several thousand spinal
20 surgeries that were the result of the payment of kickbacks; and
21 defendant and other co-conspirators paid kickback recipients between
22 approximately $9.5 million and $25 million in kickbacks relating to
23 those claims.

24     In furtherance of the conspiracy and to accomplish the objects
25 of the conspiracy, defendant and other co-conspirators committed
26 various overt acts within the Central District of California,
27 including but not limited to the following:
28 //

Overt Act No. 1

On or about September 21, 2010, defendant, on behalf of her company Orchid Medical Management, Inc. ("Orchid"), and Michael Tichon, on behalf of HealthSmart Corporate, entered into a contract under which HealthSmart Corporate would pay Orchid $12,500 per month for consulting and business development services.

Overt Act No. 2

On or about December 15, 2010, defendant sent to Drobot an email offering to introduce him to Chiropractor A, who was willing to enter into a management agreement with Drobot and refer patients to whichever doctors Drobot chose, and also reporting that Doctor A had scheduled a spine surgery at Pacific Hospital.

Overt Act No. 3

On or about December 17, 2010, defendant sent to Drobot an email offering to introduce him to Physical Therapist A, who managed surgeons' practices and who was willing to refer patients to Pacific Hospital for surgeries in return for payments.

Overt Act No. 4

On or about April 12, 2011, defendant sent to Tichon an email forwarding a list of patients referred to Pacific Hospital by Doctor B, and suggesting that Drobot switch from paying doctors in advance for surgery referrals to paying them only after they provided documentation that the referral took place.

Overt Act No. 5

On or about May 25, 2011, Drobot increased defendant's monthly salary for her marketing services from $12,500 per month to $15,000 per month.

SENTENCING FACTORS

20.  Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crimes of conviction.

21.  Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| | | |
|---|---|---|
| Base Offense Level: | 6 | [U.S.S.G. § 2B1.1(a)(2)] |
| Specific Offense Characteristics | | |
| Loss between $9.5M to $25M: | +20 | [U.S.S.G. § 2B1.1(b)(1)(L)] |
| More than 10 victims: | +2 | [U.S.S.G. § 2B1.1(b)(2)(B)] |
| Federal health care offense with gov't program loss of between $7M-$20M: | +2 | [U.S.S.G. § 2B1.1(b)(7)] |
| Adjustments | | |
| Acceptance of Responsibility: | -3 | [U.S.S.G. § 3E1.1] |
| Total: | 27 | |

18

The USAO will agree to a two-level downward adjustment for acceptance of responsibility (and, if applicable, move for an additional one-level downward adjustment under U.S.S.G. § 3E1.1(b)) only if the conditions set forth in paragraph 6(c) are met.  Subject to paragraph 7 above and paragraph 33 below, and with the exception of a 2-level downward adjustment under U.S.S.G. § 3B1.2 – which defendant reserves the right to seek - defendant and the USAO agree not to seek, argue, or suggest in any way, either orally or in writing, that any other specific offense characteristics, adjustments, or departures relating to the offense level be imposed. Defendant agrees, however, that if, after signing this agreement but prior to sentencing, defendant were to commit an act, or the USAO were to discover a previously undiscovered act committed by defendant prior to signing this agreement, which act, in the judgment of the USAO, constituted obstruction of justice within the meaning of U.S.S.G. § 3C1.1, the USAO would be free to seek the enhancement set forth in that section.

22.  Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

23.  Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

## WAIVER OF CONSTITUTIONAL RIGHTS

24.  Defendant understands that by pleading guilty, defendant gives up the following rights:

        a)  The right to persist in a plea of not guilty.

        b)  The right to a speedy and public trial by jury.

1        c)    The right to be represented by counsel – and if

2 necessary have the court appoint counsel – at trial. Defendant

3 understands, however, that, defendant retains the right to be

4 represented by counsel – and if necessary have the court appoint

5 counsel – at every other stage of the proceeding.

6        d)    The right to be presumed innocent and to have the

7 burden of proof placed on the government to prove defendant guilty

8 beyond a reasonable doubt.

9        e)    The right to confront and cross-examine witnesses

10 against defendant.

11        f)    The right to testify and to present evidence in

12 opposition to the charges, including the right to compel the

13 attendance of witnesses to testify.

14        g)    The right not to be compelled to testify, and, if

15 defendant chose not to testify or present evidence, to have that

16 choice not be used against defendant.

17        h)    Any and all rights to pursue any affirmative

18 defenses, Fourth Amendment or Fifth Amendment claims, and other

19 pretrial motions that have been filed or could be filed.

20                 <u>WAIVER OF APPEAL OF CONVICTION</u>

21     25.   Defendant understands that, with the exception of an

22 appeal based on a claim that defendant's guilty plea was

23 involuntary, by pleading guilty defendant is waiving and giving up

24 any right to appeal defendant's convictions on the offense to which

25 defendant is pleading guilty.

26         <u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE</u>

27     26.   Defendant agrees that, provided the Court imposes a total

28 term of imprisonment on the single count of conviction of no more

than the statutory maximum, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court, provided it is within the statutory maximum; (c) the fine imposed by the court, provided it is within the statutory maximum; (d) the amount and terms of any restitution order, provided it is no greater than $9.5 million; (e) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (f) any of the following conditions of probation or supervised release imposed by the Court: the conditions set forth in General Orders 318, 01-05, and/or 05-02 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions authorized by 18 U.S.C. § 3563(b)(7).

27.  The USAO agrees that, provided all portions of the sentence are at or below the statutory maximum specified above, the USAO gives up its right to appeal any portion of the sentence.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

28.  Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement, including in particular its obligations regarding the use of Cooperation Information; (b) in any investigation, criminal prosecution, or civil, administrative, or regulatory action, defendant agrees that any Cooperation Information and any evidence derived from any Cooperation Information shall be

admissible against defendant, and defendant will not assert, and
hereby waives and gives up, any claim under the United States
Constitution, any statute, or any federal rule, that any Cooperation
Information or any evidence derived from any Cooperation Information
should be suppressed or is inadmissible; and (c) should the USAO
choose to pursue any charge that was not filed as a result of this
agreement, then (i) any applicable statute of limitations will be
tolled between the date of defendant's signing of this agreement and
the filing commencing any such action; and (ii) defendant waives and
gives up all defenses based on the statute of limitations, any claim
of pre-indictment delay, or any speedy trial claim with respect to
any such action, except to the extent that such defenses existed as
of the date of defendant's signing this agreement.

<u>EFFECTIVE DATE OF AGREEMENT</u>

29.   This agreement is effective upon signature and execution
of all required certifications by defendant, defendant's counsel,
and an Assistant United States Attorney.

<u>BREACH OF AGREEMENT</u>

30.   Defendant agrees that if defendant, at any time after the
signature of this agreement and execution of all required
certifications by defendant, defendant's counsel, and an Assistant
United States Attorney, knowingly violates or fails to perform any
of defendant's obligations under this agreement ("a breach"), the
USAO may declare this agreement breached.   For example, if defendant
knowingly, in an interview, before a grand jury, or at trial,
falsely accuses another person of criminal conduct or falsely
minimizes defendant's own role, or the role of another, in criminal
conduct, defendant will have breached this agreement.   All of

defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing.  If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then:

a)   If defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea.

b)   The USAO will be relieved of all its obligations under this agreement; in particular, the USAO: (i) will no longer be bound by any agreements concerning sentencing and will be free to seek any sentence up to the statutory maximum for the crime to which defendant has pleaded guilty; (ii) will no longer be bound by any agreements regarding criminal prosecution, and will be free to criminally prosecute defendant for any crime, including charges that the USAO would otherwise have been obligated not to criminally prosecute pursuant to this agreement; and (iii) will no longer be bound by any agreement regarding the use of Cooperation Information and will be free to use any Cooperation Information in any way in any investigation, criminal prosecution, or civil, administrative, or regulatory action by the United States.

c)   The USAO will be free to criminally prosecute defendant for false statement, obstruction of justice, and perjury based on any knowingly false or misleading statement by defendant.

d)   In any investigation, criminal prosecution, or civil, administrative, or regulatory action by the United States:
(i) defendant will not assert, and hereby waives and gives up, any

23

claim that any Cooperation Information was obtained in violation of the Fifth Amendment privilege against compelled self-incrimination; and (ii) defendant agrees that any Cooperation Information and any Plea Information, as well as any evidence derived from any Cooperation Information or any Plea Information, shall be admissible against defendant, and defendant will not assert, and hereby waives and gives up, any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that any Cooperation Information, any Plea Information, or any evidence derived from any Cooperation Information or any Plea Information should be suppressed or is inadmissible.

31. Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was not filed as a result of this agreement, then:

a)   Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b)   Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

## COURT AND PROBATION OFFICE NOT PARTIES

32. Defendant understands that the Court and the United States Probation Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

24

33.  Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 21 are consistent with the facts of this case.  While this paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

34.  Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to fulfill all defendant's obligations under this agreement. Defendant understands that no one can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

## NO ADDITIONAL AGREEMENTS

35.  Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional

1  promise, understanding, or agreement may be entered into unless in a

2  writing signed by all parties or on the record in court.

3  <u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

4      36.  The parties agree that this agreement will be considered

5  part of the record of defendant's guilty plea hearing as if the

6  entire agreement had been read into the record of the proceeding.

7  AGREED AND ACCEPTED

8  UNITED STATES ATTORNEY'S OFFICE
   FOR THE CENTRAL DISTRICT OF CALIFORNIA
9

10  EILEEN M. DECKER
    United States Attorney

11

12  _____        _____
    JOSHUA M. ROBBINS                        Date
13  Assistant United States Attorney

14  _____        January 18, 2016
    LINDA MARTIN                             Date
15  Defendant

16  _____        1/18/16
17  ANNE HWANG                               Date
    Attorney for Defendant
18  LINDA MARTIN

19

20

21

22

23

24

25

26

27

28

                            26

CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorneys. I understand the terms of this agreement; and I voluntarily agree to those terms. I have discussed the evidence with my attorneys, and my attorneys have advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorneys in this matter, and I am pleading guilty because I am guilty of the charges and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_Linda Martin_                    _January 18, 2016_
LINDA MARTIN                        Date
Defendant

1
             <u>CERTIFICATION OF DEFENDANT'S ATTORNEY</u>

2
    I am Linda Martin's attorney.  I have carefully and thoroughly

3
discussed every part of this agreement with my client.  Further, I

4
have fully advised my client of her rights, of possible pretrial

5
motions that might be filed, of possible defenses that might be

6
asserted either prior to or at trial, of the sentencing factors set

7
forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines

8
provisions, and of the consequences of entering into this agreement.

9
To my knowledge: no promises, inducements, or representations of any

10
kind have been made to my client other than those contained in this

11
agreement; no one has threatened or forced my client in any way to

12
enter into this agreement; my client's decision to enter into this

13
agreement is an informed and voluntary one; and the factual basis

14
set forth in this agreement is sufficient to support my client's

15
entry of guilty plea pursuant to this agreement.

16

17
_____      _____1/18/16_____

18
ANNE HWANG                     Date
Attorney for Defendant

19
LINDA MARTIN

20

21

22

23

24

25

26

27

28

**UNDER SEAL**

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>                    v.<br><br>LINDA MARTIN,<br><br>                    Defendant. | SA CR No. 16-<br><br>I N F O R M A T I O N<br><br>[18 U.S.C. § 371: Conspiracy]<br><br>**[UNDER SEAL]** |

The United States Attorney charges:

[18 U.S.C. § 371]

A.   RELEVANT PERSONS AND ENTITIES

At all times relevant to this Information:

1.   Healthsmart Pacific Inc., doing business as Pacific Hospital of Long Beach ("Pacific Hospital") was a hospital located in Long Beach, California, specializing in surgeries, particularly spinal and orthopedic surgeries.  From at least in or around 1997 to October 2013, Pacific Hospital was owned and/or operated by Michael D. Drobot ("Drobot") and other co-conspirators.

//

1



2.    From at least September 2010 to at least February 2013, defendant LINDA MARTIN ("MARTIN") was a marketer for Pacific Hospital.

3.    International Implants LLC ("I2") was a limited liability company owned and operated by Drobot, that was located in Newport Beach, California.  I2 purchased implantable medical devices ("hardware") for use in spinal surgeries from original manufacturers and sold them to hospitals, particularly Pacific Hospital.

B.    RELEVANT LEGISLATION

4.    The California Workers' Compensation System ("CWCS") was a system created by California law to provide insurance covering treatment of injury or illness suffered by individuals in the course of their employment.  Under the CWCS, employers were required to purchase workers' compensation insurance policies from insurance carriers to cover their employees.  When an employee suffered a covered injury or illness and received medical services, the medical service provider submitted a claim for payment to the relevant insurance carrier, which then paid the claim.  Claims were submitted to and paid by the insurance carriers either by mail or electronically.  The CWCS was governed by various California laws and regulations.

5.    California law, including but not limited to the California Business and Professions Code, the California Insurance Code, and the California Labor Code, prohibited the offering, delivering, soliciting, or receiving of anything of value in return for referring a patient for medical services.

//

6. Before January 2013, California law allowed a hospital to bill the cost of medical hardware separately from the other costs of a surgery, such as the hospital's and surgeon's services, the reimbursement rates of which were set by a fee schedule. The hardware was considered a "pass-through" cost and billing was limited to $250 over what the hospital paid for the hardware.

7. The Federal Employees' Compensation Act ("FECA") provided benefits to civilian employees of the United States, including United States Postal Service employees, for medical expenses and wage-loss disability due to a traumatic injury or occupational disease sustained while working as a federal employee. Benefits available to injured employees included rehabilitation, medical, surgical, hospital, pharmaceutical, and supplies for treatment of an injury. The Department of Labor ("DOL") – Office of Workers' Compensation Programs ("OWCP") was the governmental body responsible for administering the FECA. When a federal employee suffered a covered injury or illness and received medical services, the medical service provider submitted a claim for payment by mail or electronically to Affiliated Computer Services ("ACS"), located in London, Kentucky, which was contracted with the DOL to handle such claims. Upon approval of the claim, ACS sent payment by mail or electronic funds transfer from the U.S. Treasury in Philadelphia, Pennsylvania to the medical service provider.

8. Federal law prohibited the offering, delivering, soliciting, or receiving of anything of value in return for

referring a patient for medical services paid for by a federal health care benefit program.

C.   OBJECTS OF THE CONSPIRACY

9.   Beginning in or around September 2010, and continuing to in or around February 2013, in Orange and Los Angeles Counties, within the Central District of California, and elsewhere, defendant MARTIN, together with others known and unknown to the United States Attorney, knowingly combined, conspired, and agreed to commit the following offenses against the United States:  Mail Fraud and Honest Services Mail Fraud, in violation of Title 18, United States Code, Sections 1341 and 1346; Use of an Interstate Facility in Aid of Racketeering, in violation of Title 18, United States Code, Section 1952(a)(3); Monetary Transactions in Property Derived from Specified Unlawful Activity, in violation of Title 18, United States Code, Section 1957; and Payment or Receipt of Kickbacks in Connection with a Federal Health Care Program, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A).

D.   MANNER AND MEANS OF THE CONSPIRACY

10.   The objects of the conspiracy were to be carried out, and were carried out, in the following ways, among others:

a.   Drobot and other co-conspirators offered to pay kickbacks to doctors, chiropractors, workers' compensation and personal injury attorneys, marketers, and others for referring workers' compensation patients to Pacific Hospital for spinal surgeries and other medical services, to be paid primarily through the CWCS and the FECA.

4

b.. Influenced by the promise of kickbacks, doctors, chiropractors, workers' compensation and personal injury attorneys, marketers, and others referred patients insured through the CWCS and the FECA to Pacific Hospital for spinal surgeries, other types of surgeries, and other medical services. The workers' compensation patients were not informed that the medical professionals had been offered kickbacks to induce them to refer the surgeries and other medical services to Pacific Hospital.

c. The surgeries and other medical services were performed on the referred workers' compensation patients at Pacific Hospital.

d. I2, or another distributor who was a co-conspirator, purchased medical hardware from a manufacturer and sold it to Pacific Hospital for use in spinal surgeries.

e. As defendant MARTIN and the other co-conspirators knew and intended, and as was reasonably foreseeable to them, in submitting claims for payment, Pacific Hospital made materially false and misleading statements to, and concealed material information from, SCIF and other workers' compensation insurance carriers, including that Pacific Hospital did not disclose to the insurance carriers that it had offered or paid kickbacks for the referral of the surgeries and other medical services for which it was submitting claims.

f. The insurance carriers paid Pacific Hospital's claims, by mail or electronically.

g. Defendant MARTIN and other co-conspirators solicited and caused others to pay kickbacks to the doctors,

5

chiropractors, workers' compensation and personal injury

attorneys, other marketers, and others who had referred patients

to Pacific Hospital for surgeries and other medical services.

The kickback recipients included, among others, various

surgeons, other doctors, chiropractors, other marketers, and

attorneys.

        h.   To conceal the nature of the kickback payments

from both workers' compensation insurance carriers and patients,

Drobot and his co-conspirators, through one of the companies

Drobot owned and/or operated, entered into bogus contracts with

the doctors, chiropractors, workers' compensation and personal

injury attorneys, marketers, and others.   The services discussed

in those contracts were provided at highly inflated prices, if

they were provided at all.   In reality, the compensation paid

was based on the number and type of surgeries and other medical

services referred to Pacific Hospital.   Defendant MARTIN helped

Drobot and other co-conspirators to establish and maintain

kickback relationships disguised under various agreements.

        i.   For example, under a lease agreement, PSPM or

Pacific Hospital would lease or sublease office space from a

doctor, but use little or none of the space for their own

activities.   Similarly, under a management agreement, PSPM

assumed financial responsibility for a doctor's office expenses

and paid a doctor a fixed percentage of the total amounts

collected from insurance for his services, in return for the

right to keep the rest of those insurance proceeds as its

purported management fee.   However, PSPM typically lost money on

these arrangements, because the amounts it paid the doctors were

more than the net insurance proceeds.  In reality, the payments made to doctors under these agreements were rewards for referring patients to Pacific Hospital.

j.   Defendant MARTIN and other co-conspirators kept records of the number of surgeries and other medical services performed at Pacific Hospital due to referrals from the kickback recipients, as well as amounts paid to the kickback recipients for those referrals.  Periodically, Drobot and other co-conspirators amended the bogus contracts with the kickback recipients to increase or decrease the amount of agreed compensation described in the contracts, in order to match the amount of kickbacks paid or promised in return for referrals.

E.   EFFECTS OF THE CONSPIRACY

11.  Had SCIF and the other workers' compensation insurance carriers known the true facts regarding the payment of kickbacks for the referral of workers' compensation patients for surgeries and other medical services performed at Pacific Hospital, they would not have paid the claims or would have paid a lesser amount.

12.  From in or around September 2010 to in or around February 2013, Pacific Hospital billed workers' compensation insurance carriers approximately $255 million in claims for spinal surgeries that were the result of the payment of a kickback; and defendant MARTIN or other co-conspirators paid kickback recipients between approximately $9.5 million and $25 million in kickbacks relating to those claims.

//

7

F.   OVERT ACTS

13.   On or about the following dates, in furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendant MARTIN and other co-conspirators known and unknown to the United States Attorney, committed various overt acts within the Central District of California, including, but not limited to, the following:

Overt Act No. 1:   On or about September 21, 2010, defendant MARTIN, on behalf of her company Orchid Medical Management, Inc. ("Orchid"), and Attorney A, on behalf of HealthSmart Corporate, entered into a contract under which HealthSmart Corporate would pay Orchid $12,500 per month for consulting and business development services.

Overt Act No. 2:   On or about December 15, 2010, defendant MARTIN sent to Drobot an email offering to introduce him to Chiropractor A, who was willing to enter into a management agreement with Drobot and refer patients to doctors chosen by Drobot, and also reporting that Doctor A had scheduled a spine surgery at Pacific Hospital.

Overt Act No. 3:   On or about December 17, 2010, defendant MARTIN sent to Drobot an email offering to introduce him to Physical Therapist A, who managed surgeons' practices and who was willing to refer patients to Pacific Hospital for surgeries in return for payments.

Overt Act No. 4:   On or about April 12, 2011, defendant sent to Attorney A an email forwarding a list of patients referred to Pacific Hospital by Doctor B, and suggesting that Drobot switch from paying doctors in advance for surgery

8

1   referrals to paying them only after they provided documentation

2   that the referral took place.

3        Overt Act No. 5:      On or about May 25, 2011, Drobot

4   increased defendant MARTIN's monthly salary for her marketing

5   services from $12,500 per month to $15,000 per month.

6

7                              EILEEN M. DECKER
                               United States Attorney

8

9

10                             LAWRENCE S. MIDDLETON
                               Assistant United States Attorney
                               Chief, Criminal Division

11

12                             DENNISE D. WILLETT
                               Assistant United States Attorney
                               Chief, Santa Ana Branch Office

13

14                             JOSHUA M. ROBBINS
                               Assistant United States Attorney

15

16                             SCOTT D. TENLEY
                               Assistant United States Attorney

17                             ASHWIN JANAKIRAM
                               Special Assistant U.S. Attorney

18

19

20

21

22

23

24

25

26

27

28